**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**GERALD RAY,**   )
                  )
      **Plaintiff,**   )      **No. 15 C 10857**
                  )
**v.**              )      **Magistrate Judge Jeffrey Cole**
                  )
**CAROLYN W. COLVIN, Commissioner**  )
**of Social Security,**   )
                  )
      **Defendant.**   )

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Gerald Ray, seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d)(2). Mr. Ray asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision and a motion for summary judgment.

**Introduction**

**I.**
**Procedural History**

Mr. Ray initially applied for Disability Insurance Benefits on May 16, 2012, alleging that he had been disabled since July 1, 2008 (R. 18). His claim was denied initially and on reconsideration (R. 80, 85). Mr. Ray filed a written request for a hearing on February 4, 2013 (R. 18, 90).

An ALJ convened a hearing on April 9, 2014, at which Mr. Ray was not represented by counsel (R. 54). The ALJ continued the hearing to allow Mr. Ray to seek representation (R. 54).

At the second hearing on July 1, 2014, Mr. Ray appeared and testified and was represented by counsel (R. 31). Julie Bose testified as the Vocational Expert ("VE") (R. 31).

On July 10, 2014, the ALJ found that Mr. Ray was not disabled and denied his application for Disability Insurance Benefits because of his ability to perform his past work as an accountant (R. 26). The ALJ's decision became the Commissioner's final decision on October 5, 2015, when the Appeals Council denied Mr. Ray's request for review (R.1). See 20 C.F.R. §§ 404.955. Mr. Ray appealed the decision to the United States District Court for the Northern District of Illinois under 42 U.S.C. § 405(g), claiming that the ALJ's decision was unsupported by substantial evidence (R. 12).

## II.
## The Record Evidence

### A.
### Vocational Evidence

Mr. Ray was born on November 21, 1953, making him 59 years old as of his alleged onset date of May 16, 2012. (R. 22, 174). He has a high school education, plus four years of college. (R. 22). According to his work history report, he worked as a liquor department clerk at a Walgreens from the fall of 1991 to the fall of 1992. (R. 179, 194). He then worked as a senior staff accountant at an accounting firm from 1998 to 2001. (R. 194). Finally, he worked as a senior staff accountant at another accounting firm from 2003 to 2006. (R. 194). As a liquor clerk at Walgreens, he used machines, tools, or equipment. (R. 197). In this role, he would walk for one hour, stand for four to six hours, climb for one hour, stoop for one hour, and not sit. (R. 197). The heaviest amount he lifted during this job was twenty pounds, and he frequently lifted ten pounds. (R. 197). As a senior staff accountant, Mr. Ray reported that he used machines, tools, equipment, and technical knowledge and skill and completed written reports. (R. 195). In a

typical work day, he would walk for one hour, stand for two hours, sit for six hours, climb for two hours, stoop for one hour, kneel for two hours, crouch for one hour, crawl for one hour, handle big objects for three hours, reach for two hours, and write for four hours. (R. 195). In this role, the heaviest weight that he lifted was fifty pounds, and he frequently lifted twenty-five pounds (R. 195). When his temporary position at an accounting firm expired June 1, 2006, Mr. Ray stopped working. (R. 178).

## B.
## Medical Evidence

On August 30, 2012, Dr. Peter Biale, MD completed an Internal Medicine Consultative Examination, as ordered by the Bureau of Disability Determination Services. (R. 262). Dr. Biale spent thirty minutes with Mr. Ray before writing his report. (R. 262). Mr. Ray complained of a disability due to diabetes and lower back problems. (R. 262). Dr. Biale observed that Mr. Ray had a rather wide-based gait. (R. 263). He noted that when Mr. Ray moved from sitting to the supine position and back up he complained of lower back pain. (R. 263). His eyesight in both his left and right eyes was 20/40. (R. 263). He had full range of motion of cervical spine, limited lumbosacral spine range of motion with flexion of forty degrees and extension of 15 degrees, right and left lateral flexion of fifteen degrees, and tenderness in the paraspinal muscles. (R. 264). His motor strength 5/5 in his upper and lower extremities. (R. 264). His straight leg raise test was positive at ten degrees in the right side, and his sensory was diminished in left lower extremity. (R. 264). Dr. Biale noted full range of motion in all joints and no redness, swelling, or thickening. (R. 264). Mr. Ray could bear his own weight, and had no difficulty getting on and off the examination table. (R. 264). He did, however, have difficulty squatting. (R. 264). Regarding Mr. Ray's mental state, Dr. Biale noted that he was alert, oriented, cooperative, polite, sincere,

his memory was intact, he was able to concentrate and pay attention, had good hygiene, and was dressed appropriately. (R. 265).

Dr. Biale's clinical impressions were that Mr. Ray suffered from diabetes mellitus Type II under treatment with oral medications. (R. 265). He found Mr. Ray's glycemia to be poorly controlled. (R. 265). He also found that Mr. Ray had developed gastroparesis, which was under treatment, and suffered from diabetic neuropathy, which caused persistent pain in the lower extremities. (R. 265). He also suffered from lower back pain and sciatic pain in the right lower leg. (R. 265).

The Radiological Examination from August 30, 2012, which was ordered by the Bureau of Disability Determination Services, revealed mild to moderate degenerative joint disease, and that osteopenia had appreciated throughout all aspects of the lumbosacral spine with some small osteophytes as well. (R. 267).

On December 19, 2012, Dr. Charles Carlton also performed an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services. (R. 269). Dr. Carlton spent thirty minutes with Mr. Ray. (R. 269). Mr. Ray told Dr. Carlton that Dr. Malik at Provident Hospital was his primary care provider and that he had no insurance or medical care. (R. 270). He lost his medical card in July 2011. (R. 270). Consequently, Mr. Ray said that he used the emergency department at Provident Hospital as primary care. (R. 270). The examination revealed full painless range of motion in all joints and some decreased range of motion at the lumbar spine. (R. 272). Mr. Ray had normal grip strength and was alert and oriented. (R. 272). However, Dr. Carlton did recommend that Mr. Ray have a consultative evaluation with a psychologist. (R. 272).

Dr. Carlton's clinical impressions were that Mr. Ray suffered from diabetes, high blood pressure, peripheral neuropathy, reports of chronic back pain and sciatic pain, reports of vision problems, and reports of depression. (R. 272). He believed that Mr. Ray could sit and stand, walk greater than 50 feet without an assistive device, handle objects using both hands, and lift up to twenty pounds. (R. 273). Dr. Carlton thought that there was no need for Mr. Ray to use an assistive device and observed that he had no difficulty getting on and off the table. (R. 273). He observed that Mr. Ray had mild difficulty walking on his toes and heels and tandem walking and had moderate difficulty squatting and rising. (R. 273). He found that Mr. Ray had no difficulty opening doors, buttoning, zipping, tying shoes, no degree of weakness, and no difficulty holding pens or holding a cup. (R. 274). He had normal range of motion in all categories. (R. 274). His right eye vision was 20/30 and his left eye vision was 20/40. (R. 277).

Dr. Dennis Karamitis performed a Formal Mental Status Evaluation for the Bureau of Disability Determination Services on December 22, 2012. (R. 280). Dr. Karamitis spent 45 minutes with Mr. Ray. (R. 280). Mr. Ray told Dr. Karamitis that he got a total of three to four hours of sleep each night. (R. 281). He reported suicidal ideations but no attempts (R. 281). Dr. Karamitis found that he was cooperative and self-disclosing, with a depressed mood and affect. (R. 281). His mood was restricted in range, blunted, flat, and sad. (R. 281). Mr. Ray said that he fell victim to physical abuse as a child and adolescent and was shot and sustained knife inflicted stab wounds and a head injury. (R. 283). Dr. Karamitis found that Mr. Ray's performance on the mental status portion was "somewhat consistent with his level of education but also compromised by the depression that currently has a hold on him and is quite notable for the delay in which he was able to provide answers." (R. 283).

On June 27, 2013, Mr. Ray went to Cook County hospital, complaining of back pain. (R. 291). His diagnosis was back pain and neuropathy. (R. 293). The doctor's impression was that he suffered from severe multilevel degenerative spondylosis of the cervical spine, causing significant bilateral neurocozoaminal narrowing of the spine. (R. 319-20). On February 15, 2014, Mr. Ray went to the hospital complaining of pain in the left side of his neck, shoulder, and scapula. (R. 322). The medical report noted straightening of the normal cervical lordosis, probably from muscle spasms, severe degenerative spondylosis of the mid to lower cervical spine with disc space narrowing, and mild degenerative changes of the thoracic spine. (R. 322).

On March 12, 2014, Mr. Ray saw Dr. Mallick and complained that his neck and back was locking up. (R. 288). On March 17, 2014, Mr. Ray went to Cook County Hospital complaining of cramping in his right foot. (R. 286).

## C.
### The Administrative Hearing Testimony

### 1.
### Mr. Ray's Testimony

On July 1, 2014, Mr. Ray had his second hearing with the ALJ.[1] (R. 33). First, he testified that he last worked at an accounting firm, Levy and Rabyne in Skokie, Illinois, for approximately one month. (R. 35). The last time that Mr. Ray had a job lasting longer than a few months was with the International Academy of Design and Technology, where he was hired do a compliance audit. (R. 36). Mr. Ray testified that he would not be able to competently execute the duties of an accountant today because of his inability to concentrate due to the pain in his back and his legs. (R. 36).

Mr. Ray then testified that he had been experiencing pain in his lower back since 2008. (R. 36). The pain ran from his neck to his shoulders and lower back and radiated down his legs,

_____

[1] At Mr. Ray's first hearing, the case was postponed in order for Mr. Ray to find counsel. (R. 54-55).

more the right leg than the left. (R. 36). He felt tingling and numbness in his legs, and had cramps in his feet, specifically around his toes. (R. 37). It hurt him to both walk and sit for an hour or more. (R. 36).

Dr. Winston Burke at Provident Hospital had given him pain medication. (R. 37). More specifically, he testified that he took Gabapentin, Tramadol, and Ibuprofen. (R. 37). He began taking the Ibuprofen in 2008, but only recently began taking Gabapentin. (R. 37). He took these medicines every three to four hours. (R. 37). He was also on Metformin for his diabetes, which he testified had not gotten better or worse as a result of the medicine. (R. 39).

He started experiencing extreme neck pain in February of 2014, going to the doctor for pain on February 15, 2014. (R. 38). He testified that the pain got progressively worse each day, and he feared that if he did not see a doctor he would not be able to get off the couch. (R. 38). He ended up calling an ambulance, and in the emergency room the doctor told him that his neck had "locked up" due to chronic arthritis in his neck. (R. 38). The doctors found degenerative spondylosis of the cervical spine at multiple levels, and instructed him to keep taking his medicine. (R. 38).

Mr. Ray testified that he lived alone in his apartment, which he afforded using a Section Eight voucher. (R. 39). He also received food stamps. (R. 39). Other than that, he had no other sources of income and no children or family. (R. 39). He occasionally conversed with friends, and he watched movies sometimes if he felt good enough.[2] (R. 40). To get to the hearing he took

---

[2] In the Function Report dated September 10, 2012, Mr. Ray reported that if he could get out of bed in the morning, he woke up at 10 a.m. and watched TV, used the computer, and read before going back to bed at 10 p.m. (R. 185). His hobbies were reading, TV, and computers, which he reported doing very well. (R. 188). He reported spending time with neighbors and their small pets that liked him. (R. 188). However, in the Function Report from December 21, 2012, he reported that his vision was diminished, making it difficult for him to read. (R. 209). His depression made it difficult for him to function (R. 209). He reported that his days consisted of waking up, getting coffee, walking around outside, going inside to watch TV, completing a few chores, and going to bed. (R. 210).

(continued...)

the bus, accompanied by a friend because he had episodes of extreme pain and muscle spasms. (R. 40). He testified that he went to the grocery store twice per month, using public transportation. (R. 40). He also took public transportation to the doctor.[3] (R. 40). Rather than going out to eat, he cooked at home. (R. 41). His last trip was fifteen or twenty years ago. (R. 41). He never had a driver's license because he said that he never bothered to get one. (R. 41-42). Mr. Ray testified that he could only walk about one block before experiencing extreme pain. (R. 41).

The longest he ever held a job was when he first started out as a financial analyst in 1978. (R. 42). In the last ten or fifteen years, the longest he worked was for one year as an accountant for various employers doing consultant work. (R. 42). He had no problem doing his last job. (R. 42). However, eventually his vision deteriorated and his pain became so bad that he could not maintain the standard of producing accurate and reliable work. (R. 42-43). As an accountant, the maximum amount of weight that he could lift was twenty pounds, helping clients move boxes of files. (R. 43). The amount of time that he carried the boxes of files varied from a couple times per day to more than that. (R. 43). The maximum amount of standing and walking he had to do during an eight-hour day was about an hour. (R. 43).

Mr. Ray brought a cane to the hearing and testified that he had the cane since his operation in 2008.[4] (R. 43). The cane was prescribed by his podiatrist, Dr. Winston Burke, who performed the

---

[2](...continued)

[3] In the Function Report from September 10, 2012, Mr. Ray reported that he went outside everyday, always traveling by walking or by bus. (R. 187). In the Disability Appeals Report from October 12, 2012, he reported that he could not get outside as much as he used to. (R. 206).

[4] In the Function Report from September 10, 2012, Mr. Ray reported that he also used a cane when his back and legs hurt. But it was not prescribed for that purpose. (R. 190).

initial operation on his left foot. (R. 43-44). That operation, to the best of Mr. Ray's memory, was in 2008 (R. 44).

He testified that, at the time of the hearing, his pain was at a level between eight and nine, on a scale of one to ten, with ten being "excruciating, unbearable pain." (R. 44). His pain reached this level daily, generally as a result of sitting or standing for too long.[5] (R. 44). After an hour of sitting or standing, Mr. Ray testified that he would experience pain in his lower back, muscle spasms, some pain in the leg, some pain in the upper shoulder and some in the neck.[6] (R. 44).

To relieve this pain, he was only able to lay down and rest until it went away. (R. 45). He complained of side effects such as occasional dizziness, disorientation, and sometimes nausea as a result of the Gabapentin. (R. 45). However, he did not recall telling his doctor about these symptoms. (R. 45).

He reported the claims onset date to be July 1, 2008 because that is when he started experiencing swelling of his feet and pain in his legs. (R. 45). He was unable to do yard work or

---

[5] In the Function Report from September 10, 2012, Mr. Ray noted that his injuries caused him to wake up in the middle of the night with leg and back spasms, pain and occasionally his arms and feet asleep. (R. 185). He reported occasionally having spasms while getting dressed, causing him to have to wait before finishing to get dressed. (R. 185). He noted that his condition affected his ability to lift, squat, bend, stand, walk, kneel, and climb stairs. (R. 189). He had trouble doing these as a result of pain in the legs, back, and spasms. (R. 189). He could walk about two blocks without needing to rest. (R. 189). He reported following both written and spoken instructions well. (R. 189). In the Disability Report from December 21, 2012, he reported neuropathy in his left leg and foot, preventing him from walking more than two blocks. (R. 210). His Sciatica affected his right hip, resulting in immobilizing cramps. (R. 210). He reported waking up with convulsive spasms in his legs and with anxiety attacks. (R. 210). He also reported difficulty putting pants on and unsteady hands when he shaved. (R. 210). He complained of problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, and following instructions. (R. 214). He could only walk one block without needing to rest for fifteen to thirty minutes. (R. 214). He could pay attention for about thirty minutes, but could not finish what he started. (R. 214). He frequently had to have spoken instructions repeated, and he shut down in response to stress. (R. 214-15). He reported suffering from anxiety attacks, fear attacks, fear of others, and agoraphobia. (R. 215).

[6] In the Function Report dated September 10, 2012, Mr. Ray reported that if he was able to get out of bed in the morning without pain in his back, arms, and feet, he could walk about two blocks before having spasms in his legs and back. (R. 184).

sweep, but he could occasionally vacuum.[7] (R. 46). He also testified that he had problems with depression, first noticing the problems about four years ago.[8] (R. 46). He reported that he never saw a doctor for these symptoms of depression because he was ashamed. (R. 47).

## 2.
## The Vocational Expert's Testimony

The VE, Julie Bose, testified that Mr. Ray's past work in a non-CPA accountant position, was a sedentary, skilled job, according to the DOT. (R. 48). In response to the ALJ's first hypothetical, she testified that a claimant 1) with at least a high school education, 2) sharing Mr. Ray's work background, 3) limited to sedentary work, 4) able to lift ten pounds at a time, 5) occasionally able to carry or lift files, 6) able to use small tools as sedentary work, 7) requiring the ability to sit or stand alternately at will provided they were not off task for more than ten percent of the work period, 8) able to occasionally climb ladders, ropes or scaffolds, ramps or stairs, 9) able to balance, stoop crouch or crawl, would be able to perform Mr. Ray's past work as an accountant. (R. 48-49).

In the second hypothetical, the ALJ added that the claimant would be off task twenty percent of the time instead of no more then ten per cent. (R. 49). The VE testified that, given that additional restriction, the claimant would be unable to perform Mr. Ray's past work, nor could he perform other jobs because there would be no transferability of skills, and twenty percent off-task would rule out any unskilled work. (R. 49). In the third hypothetical, the ALJ further

---

[7] In the Function Report dated September 10, 2012, Mr. Ray reported that he was able to clean, vacuum, and do laundry for variable amounts of time, depending on what needed to be done. (R. 186). He reported that he would like help doing these things because it is sometimes difficult for him to get motivated. (R. 186). In a Disability Report from December 21, 2016, he reported that he washed dishes, did laundry, and vacuumed, and that these tasks took him from a half hour to two hours each week. (R. 211).

[8] In a Disability Report from February 4, 2013 he reported suffering from depression. (R. 222). In the same report, he also noted that he was unable to take care of himself due to pain in his legs, and complained of pain all over his shoulders, legs, and back. (R. 224-25).

limited the claimant to sedentary work, and standing or walking approximately one hour per eight-hour work day and sitting for approximately five to six hours in an eight-hour day. (R. 49). The VE testified that if the claimant could sit for six hours and stand one hour, he could return to past sedentary work as an accountant, but not if he could only sit for five hours and stand only one. (R. 49).

Mr. Ray's attorney gave the VE a fourth hypothetical. (R. 50). It was the same as the ALJ's first hypothetical, but the claimant also required a cane for support. (R. 50). The VE testified that this would disallow the past work as the claimant indicated he performed it either at the light or medium level but, as such work was generally performed in the national economy at the sedentary level, a cane should not be a problem. (R. 50). The attorney gave the VE one final hypothetical adding that the claimant had to rest for an hour after sitting up for two hours. (R. 50). The VE stated that this would make the claimant unemployable. (R. 50).

### III.
### The ALJ's Decision

On July 10, 2014, the ALJ found that Mr. Ray was not disabled and, therefore, did not qualify for Social Security Disability Insurance. (R. 15-30). First, the ALJ concluded that Mr. Ray had not engaged in substantial gainful activity since May 16, 2012, the date he applied for benefits. (R. 20). Second, the ALJ found that Mr. Ray had the following severe impairments: diabetes mellitus-peripheral neuropathy, degenerative disc disease, and cervical spinal stenosis. (R. 20). He also found that Mr. Ray had non-severe impairments of hypertension and depression. (R. 20). Mr. Ray's blood pressure was under control and his depression did not cause more than a minimal limitation to his ability to perform basic mental work activities. (R. 20). Mr. Ray's depression resulted in no more than mild restrictions in his daily activities, social functioning, and ability to maintain concentration, persistence, and pace. (R. 20). The ALJ noted that there

was no evidence of abnormal thought process or content and no record of mental health treatment during the relevant period. (R. 20).

Third, the ALJ found that Mr. Ray did not have an impairment or combination of impairments that met or was equal to the severity of the ones listed in 20 CFR Part 404, Subpart P, Appendix 1 (R. 21). 20 CFR 416.920(d). Fourth, he found that Mr. Ray had the residual functional capacity (RFC) to lift up to ten pounds occasionally, lifting/carrying files, ledgers and small tools to perform sedentary work, allowing for sitting or standing alternatively at will, provided he was not off-task more than ten percent of the work period, and occasionally climb ladders, ropes or scaffolds, climb ramps or stairs, balance, stoop, crouch, kneel, or crawl. (R. 21). In determining Mr. Ray's RFC, the ALJ considered his symptoms and their severity using a two-step process. (R. 22).

First, he determined whether there was an underlying medically determinable impairment, and second whether that impairment could produce Mr. Ray's pain or symptoms. The ALJ summarized Mr. Ray's vocational experience and his disability allegations: inability to work due to diabetes mellitus with peripheral neuropathy, degenerative disc disease, cervical spinal stenosis, depression, and vision problems. (R. 22). He listed Mr. Ray's pain medications: Gabapentin (nerve pain medication and anticonvulsant), Tramadol (narcotic to treat pain), and Ibuprofen (anti-inflammatory). (R. 22). He also summarized Mr. Ray's testimony regarding daily activities. (R. 22)

After considering his testimony, the ALJ concluded that Mr. Ray's medically determinable impairments could reasonably be expected to cause his symptoms; however, his statements about the intensity, persistence and limiting effects of the symptoms were not credible. (R. 22). The ALJ listed a number of reasons why he disbelieved the extent of Mr. Ray's allegations. First, the

ALJ said that medical evidence did not support Mr. Ray's allegations as to the severity of his impairments. (R. 22). Diagnostic studies and physical exam reports listed no significant findings to support disability. (R. 22). He noted that after one year of treatment, Mr. Ray reported that he was doing "ok" and had no other complaints. (R. 22). Six months later, he had an internal medicine consultative exam with Dr. Biale, but he did not complain of neck pain, numbness or tingling in his right leg, cramps in feet or vision problems. (R. 22). During the exam, he had a full range of motion in the cervical spine and all joints and decreased range of motion in his lumbar spine. (R. 22). The ALJ noted that while he had a positive Romberg, there were no signs of atrophy or diminished motor strength in upper and lower extremities. (R. 23). Mr. Ray's fine and gross manipulations were unimpaired, and his lumbar X-rays showed only mild to moderate degenerative joint disease. (R. 23).

While acknowledging that both internal medicine consultative examinations documented the most significant findings related to Mr. Ray's allegations of pain/numbness, the ALJ noted that there was no evidence of treatment between February 1, 2012 and August 30, 2012. (R. 23). Further, treatment notes after that document minimal clinical findings related to allegations of pain and numbness. (R. 23). The ALJ pointed out that Mr. Ray did not seek treatment for his pain and numbness until six months later. (R. 23). Further, when he went to the hospital on June 27, 2013, he had full range of motion (R. 23). The ALJ then discussed the fact that subsequent treatment notes after February 2014 showed improvement. (R. 23).

He next found that Mr. Ray's course of treatment and use of medications was inconsistent with the alleged severity of his impairments. (R. 24). Mr. Ray sought treatment infrequently, and received routine and conservative treatment with good response. (R. 24). He had no history of treatment with spinal injections or surgical intervention. (R. 24). His treatment was limited to

medication and undocumented physical therapy. (R. 24). The limited doctor's notes showed that his pain improved. (R. 24). Further, he received no mental health treatment for depression nor for his alleged deteriorating vision. (R. 24). His medial records do not document any side effects of his medications, and at the hearing Mr. Ray admitted that his medications helped with his pain. (R.24).

Next, the ALJ found that Mr. Ray's activities of daily living were inconsistent with his pain. (R. 24). He noted that Mr. Ray was independent in his daily activities, living alone and caring for himself. (R. 24). He took public transportation alone and went shopping alone. (R. 24). He was also able to socialize with friends. (R. 24). The ALJ acknowledged that activities of daily living are not dispositive, but rather are factors used to assess a claimant's allegations regarding their limitations. (R. 24). The ALJ also pointed out that Mr. Ray's work history was sporadic, suggesting a secondary gain for seeking disability benefits. (R. 25). Furthermore, despite Mr. Ray's claims of pain, he participated in the hearing fully and closely without being distracted, and responded to questions appropriately. (R.25).

Next, the ALJ pointed to the fact that the DDS psychological consultant opined that Mr. Ray did not have a severe mental impairment, just mild restrictions in daily activities and mild difficulties maintaining social function and concentration, persistence and pace, without decompensation. (R. 25). The ALJ gave significant weight to this opinion because it was consistent with the record, which showed no treatment for depression. (R. 25). The ALJ found that Mr. Ray could have availed himself of mental treatment because he was "apparently familiar with the Cook County Health Care system." (R. 25). The DDS thought that Mr. Ray was capable of performing light exertion with occasional climbing of ramps/stairs, ladders, ropes, and scaffolds, and occasional balancing, stooping, crouching, kneeling, or crawling. (R. 25).

The ALJ gave moderate weight to the DDS medical consultants, to the extent that their testimony was consistent with the medical evidence. (R. 25). However, the ALJ believed that Mr. Ray could only do sedentary work that allowed sitting or standing alternatively at will, provided he was not off-task more than 10% of the work period. (R. 25). The ALJ reached this conclusion due to the new medical evidence, including cervical spinal X-rays, which confirmed spinal stenosis and ongoing back pain, which were submitted during the hearing. (R. 25). Dr. Carlton, the consulting internist, found that Mr. Ray could sit, stand, walk greater than 50 feet without an assistive device, handle objects using both hands, and lift up to twenty pounds. (R. 25). The ALJ gave some weight to Dr. Carlton's findings; however, Dr. Carlton did not provide a function-by-function analysis and the new evidence presented at the hearing supported greater limitations than Dr. Carlton found. (R. 25).

Nonetheless, however, the ALJ found that Dr. Carlton's findings demonstrated that Mr. Ray retained some ability to perform work. (R. 25). The ALJ then summarized his findings: lack of objective medical evidence, infrequent treatment, good response to routine and conservative treatment, sporadic work history, and daily activities suggesting greater mental and physical functioning than alleged. (R. 25-26). The ALJ then moved on to consider the VE's testimony. He noted that the VE explained that Mr. Ray's past accounting work was medium and skilled as he performed it, but sedentary and skilled as it was generally performed in the economy. (R. 26). Finally, based on the VE's testimony, the ALJ found that Mr. Ray was capable of performing past relevant work as an accountant as that work was generally performed. Consequently, he found Mr. Ray not disabled and not entitled to benefits under the Social Security Act. (R. 26).

**IV.**

**Discussion**

**A.**

**The Standard of Review**

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. §

405(g); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). Substantial evidence is defined

as "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (quoting *McKinzey v. Astrue,*

641 F.3d 884, 889 (7th Cir. 2011)). The standard of review is deferential, and the court may not

reconsider facts and evidence.  *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014); *Shideler v.*

*Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).  But, "this does not mean that [the court] will simply

rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v.*

*Apfel,* 227 F.3d 863, 869 (7th Cir.2000).  The ALJ must "minimally articulate" the reasons for

his ultimate conclusion by building an "accurate and logical bridge" from the evidence to the

conclusion. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *Zurawski v. Halter*, 245 F.3d

881, 887 (7th Cir. 2001); *Clifford*, 227 F.3d at 872. If the ALJ's decision "lacks evidentially

support" or is so poorly articulated as to prevent meaningful review, the case must be remanded.

*Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014); *Yurt v. Colvin*, 758 F.3d 850, 856 (7th

Cir. 2014).

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether

a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### III.
### Analysis

The first of Mr. Ray's issues with the ALJ's decision is the finding that Mr. Ray can perform sedentary work as long as he has the option to sit or stand at will. Mr. Ray argues that such a limitation is not in conformity with the definition of sedentary work, which requires the capacity to sit for six hours out of every workday. *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Mr. Ray is correct, of course – the option to sit or stand at will is an additional restriction on his capacity for sedentary work – but such a finding does not scuttle an ALJ's decision, and the Social Security Ruling that Mr. Ray relies upon does not say otherwise.

Social Security Ruling 96-9p addresses the situation where a claimant requires the option to perform a job while alternating between sitting and standing:

Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

Titles II & XVI: Determining Capability to Do Other Work Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, SSR 96-9P (S.S.A. July 2, 1996).

The ALJ followed this ruling to the letter. He defined the frequency with which Mr. Ray had to change positions: "at will"; *i.e.*, whenever he needed to. Mr. Ray's argument – that an ALJ has to specify exact time periods a claimant must stand or sit, such as 15 minutes standing, 45 minutes sitting – has been rejected by the Seventh Circuit on more than one occasion. *See Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008)(" . . . a job in which [a claimant] could sit or stand "as needed" would necessarily encompass frequent sitting and standing."); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)(rejecting argument that ALJ failed to specify frequency where "the ALJ did restrict [claimant] to work that allowed her an opportunity to sit or stand at her 'own option'"). That is likely why Mr. Ray was unable to cite a single case in support of his position.

Thus, the ALJ adequately described the frequency with which Mr. Ray must be allowed to change positions, and he presented that exact parameter to the VE, who then testified that Mr. Ray could sit or stand at will and still perform his past work as an accountant in the manner in which that work is generally performed in the economy. This is exactly the procedure recommended in SSR 96-9p. *See also Schmidt,* 496 F.3d at 846 ("[T]he ALJ is required only to

incorporate into his hypotheticals those impairments and limitations that he accepts as credible."). Mr. Ray does not challenge the VE's testimony, and it is perfectly logical that an accountant can perform his or her work sitting or standing in front of a computer. There are, of course, platforms designed for this vary purpose. The ALJ need not have done anything more.

Mr. Ray's argument regarding how often the ALJ determined he could be off task is similarly unfounded and, in addition, perplexing. He submits he does not know what the ALJ means by his finding that Mr. Ray could perform sedentary work that allowed him to sit or stand alternately at will, "provided [he was] not off task more than 10% of the work period." (R. 21). Mr. Ray wonders:

> What if [he] were off task ten percent of the work day or more? By implication, then it would seem he could not perform sedentary work, as stated by the vocational expert.

[Dkt. #25, at 5]. That may be true (R. 49), but the ALJ's RFC indicates that he determined that Mr. Ray would not be off task more than ten percent of the time. And, again, that is the hypothetical he presented to the VE, and the VE testified that Mr. Ray could be off task up to ten percent of the time and still perform his past work as an accountant as it is generally performed in the economy.

Next, Mr. Ray attacks the ALJ's finding that he can perform a limited range of sedentary work, including his past work as an accountant, despite cervical spine x-rays that show significant impairments of his cervical spine, lumbar spine x-rays that show moderate impairments of that area of the spine, and diabetic neuropathy. This is an argument with far more traction. Indeed, X-rays of the lumbar spine in August 2012 documented mild to moderate degenerative joint disease, along with osteopenia and osteophytes throughout, and disc space narrowing from L4 through S1. (R. 267). Cervical spine x-rays in February 2014 were worse, revealing straightening of the normal cervical lordosis, severe degenerative spondylosis of the

mid to lower cervical spine, disc narrowing from C3 to C7, along with large anterior osteophytes and foraminal narrowing. (R. 319). Mr. Ray submits that common sense dictates that, as a result of these impairments, he would be in pain if he had to perform accounting work. [Dkt. #25, at 6]. But the ALJ found that "[d]iagnostic studies and physical exams document *no significant findings* to support disability." (R. 22 (emphasis supplied)).

It's difficult to accept the ALJ's characterization of the medical evidence as "no[t] significant." Those supposedly "insignificant" findings document moderate to severe degenerative disease throughout Mr. Ray's spine, and neck to lower back. But, those findings which, by any measure, *are* significant, are one of the reasons – the primary one – that the ALJ discounted Mr. Ray's allegations. (R. 22). And that's a major problem with his decision.

An ALJ may never rest his assessment of a claimant's allegations too heavily on the objective medical evidence. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). This is true even when the ALJ thinks the medical evidence is insignificant, as the ALJ did here. *Stark v. Colvin*, 813 F.3d 684, 687–88 (7th Cir. 2016). And it is true even when there actually is no medical evidence in the record to document pain, such as in cases with illnesses and injuries that can't be documented by x-rays. *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). Here, however, we have a claimant complaining of pain in his back and neck, and x-rays documenting significant degenerative disease in both of those locations. And so, we have a combination of an ALJ being overly dismissive of medical findings that are clearly significant, and which document impairments in the very locations Mr. Ray claims, and using his interpretation of them as insignificant as the main basis for discounting Mr. Ray's allegations. That renders his assessment of Mr. Ray's allegations doubly flawed. *See Stark*, 813 F.3d at 697 (ALJ cannot

merely mention medical evidence that supports a claimants's allegations and then inexplicably fail to consider it in finding those allegations not credible).

In order to regard the medical findings as "insignificant," the ALJ had to engage in a bit of cherry-picking which, of course, is inappropriate. *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016). He focused on reports of good or full range of motion, the ability to walk 50 feet without a cane – what the Seventh Circuit has come to regard as a non-probative, "brief excursion," *Thomas v. Colvin*, 534 F. App'x 546, 551 (7th Cir. 2013); *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir.2011) – or normal grip strength and fine/gross motor skills, and either dismissed or diminished reports of significant restrictions. For example, he noted that, on August 30, 2012, Mr. Ray complained of persistent pain in his lower back and legs. The ALJ then noted he had a full range of motion in his cervical spine (R. 22); and why not, as he was not having trouble with his neck at that time.

Then the ALJ mentioned that Mr. Ray's range of motion in his lower back was reduced by more than half, he exhibited positive straight leg raising, and positive Romberg sign. All of these would tend to support his complaints, but the ALJ dismissed those results in favor of the fact that no diminished motor strength or atrophy were found in the extremities. (R. 23). He did not explain why this trumped not only positive clinical signs like range of motion or straight leg raising, but x-rays confirming moderate degenerative disease as well. (R. 23). On other occasions, Mr. Ray exhibited spasm, decreased sensation to light touch in his legs, positive straight leg raising, altered gait, but the ALJ would also mention findings such as an x-ray that was negative for pulmonary disease, or the ability to rise unassisted from a seated position as though the latter findings trump or at least balance out the former. In short, one cannot follow the path of his reasoning. *See Murphy v. Astrue*, 496 F.3d 630, 634–35 (7th Cir. 2007)(ALJ

must explain why evidence supporting a finding of disability outweighs other evidence); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007).

Throughout his discussion of the medical evidence, the ALJ focused on Mr. Ray's limited treatment, and this was another reason for discounting his allegations. And so there are repeated references like "[a]fter being lost to treatment for a year" (R. 23), "[a]pproximately six months later" (R. 23), ". . . did not seek treatment . . . until approximately six months later" (R. 23), or "[a]fter being lost to treatment for 8 months." (R. 24). The treatment that Mr. Ray did undergo in an array of prescription medications, the ALJ characterized as "conservative" and determined that, when combined with infrequent trips to the doctor, rendered Mr. Ray's allegations not credible. (R. 24). There are significant issues with employing either one of these factors as a basis for discounting a claimant's complaints.

The Seventh Circuit, taking its cue directly from the Commissioner's regulations, has had this to say about sporadic treatment as a basis for disbelieving a claimant's complaints:

> In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment. However, the ALJ "must not draw any inferences" about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care. An inability to afford treatment is one reason that can "provide insight into the individual's credibility."

*Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)(relying on SSR 96-7p)[9](citations omitted).

Although Mr. Ray testified that he had no insurance or medical card and was confined to seeking

---

[9] SSR 96-7p has been replaced by SSR 16-3p. In the new ruling, the Social Security Social Security Administration announced that it would no longer assess the "credibility" of an applicant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." Social Security Ruling 16-3p; "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 81 Fed. Reg. 14166, 14167 (effective March 28, 2016). The ruling was intended to clarify that administrative law judges aren't in the business of impeaching claimants' character. Obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence. *See Cole v. Colvin*, – F.3d –,–, 2016 WL 3997246, at *1 (7th Cir. July 26, 2016). In this case, as the ALJ did not consider Mr. Ray's character in his assessment, the change in focus does not affect the analysis.

treatment at the emergency room at county hospitals (R. 270), the ALJ did not mention this when he criticized Mr. Ray's infrequent treatment, which he found significant. (R. 24). *See Cole v. Colvin*, 831 F.3d 411, 415 (7th Cir. 2016)(ALJ had to acknowledge that lack of health insurance may explain lack of treatment); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013)(resort to emergency rooms for treatment not always a viable option).

As for the type of treatment Mr. Ray received, it is true that he had not had surgery or epidural injections. Then again, there's no record of any physician saying either of those things would help, and, again, finances might have something to do with the type of treatment Mr. Ray had. *See Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015). An ALJ must consider possible explanations for a conservative course of treatment. *Id.*; *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). And Mr. Ray did take several prescription drugs, including a strong, narcotic pain reliever. This type of drug regimen, rather than detract from the believability of a claimant's assertions, should tend to bolster it. *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).[10]

As a final rationale for dismissing Mr. Ray's allegations, the ALJ posited his daily activities, finding that they were inconsistent with his complaints. (R. 24). The ALJ then listed those activities: he lives alone and cares for himself. He is able to travel alone on public transportation. He shops alone. He socializes with friends. (R. 24). That's not much in the way of activities. Mr. Ray's actual testimony put an even more limited spin on it. He grocery shopped just twice a month. (R. 40). He didn't go out much at all; he never went out to eat. He had not taken a trip in 15 to 20 years. (R. 41). He didn't even watch much TV unless he felt physically up to sitting through a movie occasionally. (R. 40). While he took public transit to

---

[10] The ALJ asserted that Mr. Ray "admitted at the hearing that his medications help somewhat to alleviate pain." (R. 24). Actually, he testified that they a combination of medication and lying down, which iof course who would not be able to do while working, abated the pain. (R. 45).

his hearing, a friend accompanied him so that he'd have someone with him if he had an problems with extreme pain. (R. 40). He did no yard work but vacuumed if he was up to it. (R.46).

While the ALJ acknowledged that he could not base a finding of non-disability on daily activities alone, he did not explain the import of such a restricted schedule in the determination. It's not self-evident that such limited activities are inconsistent with allegations that one is unable to sit, stand, or walk for very long at a time. *See Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016)("The ALJ's invocation of [claimant's] activities of daily living to discount her testimony that her limitations are more than minimal . . . is problematic . . . .") Again, the path of the ALJ's reasoning is simply not clear.

## CONCLUSION

In the end, the ALJ's decision must be remanded to the Commissioner for another look. It's not necessarily the case that the ultimate result is wrong; it's that the ALJ failed to build a logical bridge from the evidence to his conclusions. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(Posner, J.)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). The ALJ does not explain why the x-rays documenting moderate to significant degenerative disease in Mr. Ray's cervical and lumbar spine are not significant. The ALJ focuses on normal findings in reports of exams and does not explain why these outweigh the abnormal findings. The ALJ holds Mr. Ray's sporadic treatment against him despite the fact that he has no insurance and no medical card. And he fails to

elaborate on why Mr. Ray's limited activities undermine his claim that he is unable to sit, stand, or walk for very long at one time.

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/4/16